Filed 5/4/22  P. v. Horsley CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ALLEN RAY HORSLEY,<br><br>    Defendant and Appellant. | F079482<br><br>(Super. Ct. No. VCF343288A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Joseph A. Kalashian and Juliet L. Boccone, Judges.[†]

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, Sally Espinoza and Julie A. Hokans, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

[†]    Judge Kalashian, a retired judge of the Tulare Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution, presided over defendant's jury trial; Judge Boccone pronounced defendant's sentence.

**INTRODUCTION**

On November 3, 2016,[1] defendant Allen Ray Horsley engaged in a verbal altercation with Dustin Montgomery before shooting him in the head and killing him. A jury convicted defendant of murder and assault with a firearm and found true allegations that defendant intentionally used and discharged a firearm. The trial court sentenced defendant to a total term of 50 years to life in prison.

Defendant contends on appeal that (1) the trial court erred by instructing the jury as to self-defense relating to the murder charge and not the assault charge; (2) the trial court erred in responding to the jury's question regarding the definition and effect of provocation in their consideration of the murder charge; (3) trial counsel was ineffective in failing to object to the prosecutor's closing argument that compared premeditation and deliberation to a baseball player's decision to swing at a ball and a driver's decision not to stop at a yellow traffic light; (4) trial counsel was ineffective in failing to object to the trial court's imposition of fines, fees, and assessments without considering defendant's ability to pay; and (5) the trial court erred in calculating defendant's presentence custody credits. In addition, both parties agree that we must remand this matter for resentencing under new legislation that took effect on January 1, 2022.

We accept the parties' agreement that these enactments apply retroactively to this case and require remand for resentencing. We also conclude that defendant is entitled to custody credits for the period of March 22 through June 13, 2019 (after defendant was found competent to stand trial and while he awaited transport from the state hospital). In all other respects, we affirm the judgment.

**PROCEDURAL BACKGROUND**

The District Attorney of Tulare County filed a second amended information on August 6, 2018, charging defendant with the murder of Montgomery (Pen. Code, § 187,

---

[1] Subsequent references to dates are to dates in the year 2016, unless otherwise stated.

subd. (a);[2] count 1) with the special allegation that defendant personally and intentionally discharged a firearm that caused great bodily injury and death (§ 12022.53, subd. (d)) and assault with a firearm (§ 245, subd. (a)(2); count 3) with the special allegation that defendant personally used a firearm (§ 12022.5, subd. (d)). Defendant pleaded not guilty and denied the special allegations.

After a five-day trial, the jury convicted defendant of first degree murder and assault with a firearm on February 11, 2019. The jury also found true the allegations that defendant personally discharged a firearm causing great bodily injury in committing the offense charged in count 1 (§ 12022.53, subd. (d)) and personally used a firearm in committing the offense charged in count 3 (§ 12022.5, subd. (d)).

On June 13, 2019, the trial court denied defendant's motion for a new trial and sentenced him. As to count 1, the court sentenced defendant to a term of 25 years to life, plus 25 years for the section 12022.53, subdivision (d) enhancement. As to count 3, the court sentenced defendant to a concurrent, four-year term, plus 10 years for the section 12022.5, subdivision (d) enhancement. Defendant was sentenced to a total term of imprisonment of 50 years to life, and the court imposed a $10,000 restitution fine (former § 1202.4), a suspended $10,000 parole revocation fine (§ 1202.45, subd. (a)), victim restitution (former § 1202.4, subd. (f)(2)),[3] an $80 court operations assessment (§ 1465.8), and a $60 criminal conviction assessment (Gov. Code, § 70373). The court credited defendant with 868 days for time he spent in custody.[4]

This timely appeal followed on June 13, 2019.

---

[2] Statutory references are to the Penal Code unless otherwise noted.

[3] The court ordered that defendant pay $3,057.29 to the California Victim Compensation Board and that restitution remain open.

[4] The probation officer's report calculated defendant's custody credits as of March 21, 2019, which was the date originally set for sentencing.

## FACTS

### I. The prosecution case.

#### A. Steffany Riley

Steffany Riley was living with Jennifer Chatten in a trailer park in Goshen in November. She had been living there for a month. Riley met Montgomery six or seven months earlier, and they were friends. Late in the evening on November 2, Montgomery showed up at Chatten's trailer and they watched television. Chatten was not home at the time. When Chatten arrived home with her grandson, she got into an argument with Montgomery. Chatten was angry that Montgomery was at the trailer and told him to "get the fuck out." Chatten's remark resulted in back and forth bickering between Chatten and Montgomery. After Chatten put her grandson to bed, the bickering got louder, and Riley reminded them of Chatten's sleeping grandson. VanTassel, Montgomery's uncle, lived in the trailer next to Chatten's. Riley texted VanTassel to "[c]ome get [Montgomery]." Five minutes later, she texted, "[VanTassel], come get [Montgomery] now. He's being rude as fuck, please."

Montgomery left with VanTassel in Montgomery's car to go to the store.[5] Chatten left the trailer right after Montgomery. Riley saw Chatten go to a trailer that was located two or three trailers away, where defendant and another man were drinking.[6] Chatten returned to her own trailer five or ten minutes later.

Montgomery and VanTassel returned to Chatten's trailer approximately 15 minutes after they left. Riley saw their car headlights through the open trailer door where Chatten was standing. Riley could hear the conversation outside through the open

---

[5]   Riley did not remember Chatten locking the door to her trailer or Montgomery pounding on the door to come back inside as Chatten testified.

[6]   Riley did not recall the man's name but identified a picture of Anthony Labeef, who was also known as Dobby.

door and could see outside by viewing a monitor for the video camera Chatten used in the front window of her trailer.

Riley saw Montgomery standing in front of his car and believed he was waiting for her because they had plans to go fishing. Another vehicle pulled in behind Montgomery. Riley heard defendant say to Chatten, "Is that the guy? Is that the mother fucker, right there?" Chatten nodded and the man ran over to Montgomery. Montgomery was standing with his car door open, one foot in his car, and one hand on top of the car's roof.[7] Defendant told Montgomery, "You need to leave. You're not welcome here anymore." Montgomery responded with something to the effect of, "You get the fuck out of here," and defendant responded in kind.

Defendant then put a gun to Montgomery's head. Montgomery laughed and said, "Get that out of my face." VanTassel told Montgomery to get in the car and go home. Riley thought she heard something land on the hood of the car. Then she heard a gunshot and the sound of a car pulling away. Riley clarified that she did not see the shooting but only heard it.[8] She never heard Montgomery make any threats and never saw him with a weapon.

VanTassel entered her trailer screaming, "They just killed my nephew. They just shot [Montgomery]," and called 911. When Riley went outside, she saw Montgomery laying on his back, on the ground, and half-way in a mud puddle. His foot was still in his car.

Chatten took her grandson and left before the police arrived. Defendant's girlfriend and her daughter were outside after the shooting.

---

[7] When viewing the camera, Riley was able to see Montgomery's car and VanTassel, but she could only see Montgomery from the chest up because he was on the far side of the car.

[8] Sergeant McBride testified that Riley told him that she heard the altercation, saw defendant through the open door, and described defendant to him when interviewed right after the shooting.

### B.     Jennifer Chatten

Jennifer Chatten lived in a trailer park in November, and Riley was staying with her. Defendant is related to Chatten's son, and she became friends with him because he also lived in the trailer park. The evening of November 2, Chatten picked up her grandson at 10:00 p.m., went shopping, and then returned home thereafter. Montgomery was inside, sleeping in the living room. Chatten had asked Riley not to have guests when her grandson was visiting and was angry that Montgomery was in her home.

As Chatten told Riley that Montgomery had to leave, Montgomery awoke and heard her. He left the trailer, and through her video camera Chatten saw Montgomery outside the trailer urinating. He returned to the trailer and she told him to use the bathroom and not urinate outside in public. Montgomery started "screaming and yelling" at Chatten, and she repeatedly asked him to leave. Chatten testified that she was crying and that she also yelled and got loud when she cried. Montgomery walked outside, and Chatten locked the door. Montgomery pounded on the door to get back inside.

Riley texted VanTassel for assistance, and Montgomery and VanTassel went to the store. Chatten watched them leave on her camera. Chatten then walked to defendant's trailer. She saw Labeef and his girlfriend, Corbitt, sitting in Corbitt's car in defendant's driveway and spoke with them. Chatten was upset and explained to them how Montgomery had disrespected her. After they left for the store, she went back to her trailer. She denied ever seeing defendant at that time.

Chatten was standing at the door of her trailer when Montgomery and VanTassel returned. Then Labeef came up to her door and asked her if Montgomery was the individual who had disrespected her. Defendant was behind Labeef, but she did not hear him say anything. Chatten did not remember anything other than hearing that someone got shot. She left with her grandson and stayed with someone down the road.

### C. Rudolph VanTassel

Rudolph VanTassel was Montgomery's uncle. He met defendant at the trailer park where he lived and considered defendant a friend. VanTassel lived in space 6 and defendant lived in space 1 (closest to the entrance and south of VanTassel). Chatten lived next to VanTassel in space 5.

On the evening of November 2, VanTassel received a text message from Riley, a friend of Montgomery's, asking VanTassel to take her to the store. VanTassel received a second message while on his way to the restroom, asking him to take Montgomery home. Riley had been living with Chatten for two or three months. VanTassel arrived at Chatten's trailer two or three minutes later and saw Montgomery standing outside. Montgomery did not appear angry and was joking. VanTassel asked Montgomery to take him to the nearby store, located a few minutes away. Montgomery drove VanTassel to the store, and VanTassel went inside.[9] VanTassel initially testified that he saw defendant and Labeef[10] enter behind him but, upon being shown a surveillance video, acknowledged that defendant did not enter the store.

After making their purchase, Montgomery drove VanTassel back to the trailer park. During the drive, VanTassel observed headlights behind him.[11] Montgomery parked in front of the trailer next to Chatten's car. Montgomery then asked for a cigarette. VanTassel told Montgomery his cigarettes were in his trailer and invited Montgomery to come in with him. Both men got out of the car and closed the doors.

---

**9** VanTassel testified Montgomery entered the store with him. After reviewing a surveillance video showing that Montgomery stayed in the car, VanTassel still could not recall Montgomery staying in the car and thought Montgomery entered the store.

**10** VanTassel knew the individual by the nickname Dobby, but we will refer to this individual as Labeef.

**11** Sergeant McBride testified that during his initial interview with VanTassel, VanTassel told Sergeant McBride that VanTassel and Montgomery were followed from the store and that the vehicle parked one car over from them in the trailer park.

The car that followed them into the trailer park parked one car away from Montgomery's car, to the north of it. VanTassel was next to the front tire on the passenger side of Montgomery's car when defendant and Labeef rushed past VanTassel from the direction of the other car. Montgomery was still on the driver's side of the vehicle walking around the hood. Both men passed VanTassel and went right up to Montgomery. Montgomery had not said anything to either man before they approached him. Labeef was within arm's length of Montgomery when Labeef told Montgomery that he had to leave. Montgomery responded, "Who are you to tell me I have to leave?" Defendant was standing next to Labeef, pulled a gun with his left hand, and put it to Montgomery's temple. Montgomery, using his right hand, slapped the gun out of defendant's hand and grabbed his throat. The gun fell onto the center of the hood of Montgomery's car. VanTassel told Montgomery, "[D]on't, don't. Let him go. Go home. Go get in the car and go home."

Montgomery released defendant, walked to his car, opened the door, and started to get in the car. Montgomery looked over the roof of the car with his hand on the door and told VanTassel that he loved him.[12] At that point, defendant shot Montgomery in the head. Montgomery was still looking over the car when he was shot. Defendant was standing close to the outside door handle of the driver's side door, which was open at an angle.

Montgomery was not armed with either a firearm or a knife and never pulled any weapon on defendant or Labeef. Montgomery did not raise his voice or threaten anyone during the encounter, nor did Montgomery make any physical contact with anyone except for grabbing defendant after slapping the gun from defendant's hands.

---

[12] Although VanTassel admitted that he previously testified that Montgomery's last words were "Alright, uncle," he testified that Montgomery also said, "I love you." However, Sergeant McBride testified VanTassel told Sergeant McBride that Montgomery's last words were "I love you, unc [*sic*]" a month after the incident while reinterviewing him.

Defendant and Labeef ran past VanTassel the way they had come.  VanTassel ran around the car and saw Montgomery laying on the ground, parallel and a few inches from the car, with his head in a mud puddle and feet pointing towards the door.  VanTassel called 911, and the call was played for the jury.  During the call, VanTassel told the dispatcher that his nephew had been shot in the head and killed by defendant.

"Dispatch:          He shot him in the head?

"[VanTassel]:      Yes, I guess he was getting in the car leaving and he
shot him.

"Dispatch:          Did you see him shoot him?

"[VanTassel]:      Yes.

"Dispatch:          Were they arguing or what happened?

"[VanTassel]:      No, no, he was asked to leave, he was getting into his
                   car and [defendant] just shot him."  (Boldface &
                   underlining omitted.)

## D.      Detective Robbie Hebrard

Detective Robbie Hebrard, employed by the Tulare County Sheriff's Department (the sheriff's department), responded to the trailer park on November 3, at 12:53 a.m.  Upon arriving, Detective Hebrard observed VanTassel waving his arms near a car in a parking space and Montgomery on the ground near the car.  Detective Hebrard described the trailer park as having three rows of trailers.  Montgomery was in the parking space in the middle row, south of VanTassel's trailer.

Detective Hebrard observed a gunshot to Montgomery's temple.  Montgomery was unconscious but breathing.  He found Montgomery within arm's reach of the car, laying on his back.  Montgomery's head was turned and in a puddle by the rear wheel with his feet near the open driver's side door. Detective Hebrard saw a black ball cap on the car roof.  He also saw blood spatter and brain matter both on the driver's side door

and door jamb. The adjacent car similarly had been spattered with blood and brain matter.

VanTassel provided Detective Hebrard with defendant's name and directed Detective Hebrard to the trailer where defendant lived with his girlfriend. Detective Hebrard could not locate defendant.

### E.    Officer Don Deazevedo

Officer Don Deazevedo, employed by the sheriff's department, responded to a call of a possible gunshot wound victim at approximately 1:00 a.m. on November 3. Officer Deazevedo saw Montgomery lying one to two feet away from his car, with his feet pointing towards the open door. Riley advised him that defendant had shot Montgomery, but defendant was not present at the trailer when Officer Deazevedo attempted to locate him.

### F.    Ross Nakamura

Ross Nakamura worked as a field evidence technician for the sheriff's department and, before that, as a fingerprint technician. Nakamura processed the location where Montgomery was murdered. Nakamura placed evidence placards to mark areas of the crime scene relevant to the investigation. Nakamura noted blood and tissue on the ground in several places near the vehicle, including near a puddle. Human tissue was also found on the vehicle parked next to Montgomery's vehicle.

Nakamura also photographed a baseball cap found on the vehicle. The baseball cap had a large hole on the right side. The front, driver's side door of the vehicle was open, and Nakamura observed blood and human tissue on the armrest. He also observed marks on the hood and window. Nakamura described the vehicle as having a layer of dirt, but he noted a fresh hand mark on the hood appearing to swipe towards the windshield and another near the driver's side portion of the windshield, close to the door frame. Nakamura did not find any shell casings, bullets, or bullet fragments. He searched Montgomery's vehicle but did not locate any weapons.

10.

Nakamura also participated in a search of defendant's trailer. Inside the trailer, Nakamura saw a yellow hat with the words "range master," meaning a firearms trainer. Nakamura also found .45-caliber ammunition.

Nakamura acquired DNA samples from both defendant and Labeef and submitted the materials to the Department of Justice's Fresno Regional Laboratory. Nakamura also processed a vehicle registered to Victoria Marie Corbitt.[13] Nakamura obtained latent fingerprints and blood samples from the vehicle. The latent fingerprints were not matched to defendant or Labeef.

### G. Dr. Gary Allen Walter, Pathologist

Gary Allen Walter testified that he was a medical doctor and a pathologist and conducted a forensic autopsy to determine Montgomery's cause of death. He observed two gunshot wounds to Montgomery's head caused by the entry and exit of a single bullet. The entrance wound was located on the right side, toward the back of the head. The corresponding exit wound was located on the left side of the head, slightly forward from the entry wound. The entrance wound was smaller with a stellate (starlike) pattern caused by the bullet tearing the skin. This pattern is distinctive for gunshot wounds to the head. The pattern is present in head wounds that have not had direct contact with the firearm and where the bullet enters a curved part of the skull at a distance more than two feet from the muzzle, such as in this case.

If a gun is fired close to the skin's surface (while touching the skin or up to 12 inches away), hot gases from combustion of the gunpowder emitting from the gun will deposit on the skin (referred to as pattern tattooing). This will appear black on the skin. If the gunpowder burns the skin, the skin will display multiple red dot-like burn marks. Dr. Walter did not detect any pattern tattooing or burn marks on Montgomery's entry

---

[13] Corbitt was Labeef's girlfriend and had accompanied defendant and Labeef to the store and driven them back to the trailer park just before defendant shot Montgomery.

wound. Based upon the pattern of the wound and the lack of burn or powder, Dr. Walter concluded that the gun did not contact Montgomery's head and was fired from more than two feet away.

With a close contact bullet wound, the powder would enter the wound itself. If Montgomery was wearing a hat at the time he was shot, the hat may have mitigated the powder deposited on his skin, but not in the wound itself, and would be observed by the pathologist. Dr. Walter's conclusion that the gun was fired from more than two feet from Montgomery would not be affected by the presence of a hat, not even if Montgomery's head had fallen into a puddle, because the powder does not wash off.

Dr. Walter identified the larger wound as the exit wound and explained that the bullet flattens and tumbles as it passes through the skull, causing a larger exit wound. Both wounds were a size consistent with having been made by a .45-caliber bullet. Dr. Walter placed a small rod through both wounds to allow visualization of the bullet path. The bullet moved through the right side of Montgomery's skull, from slightly behind his ear, to the left side in a slightly upward and forward path.[14] Dr. Walter concluded that Montgomery died as the result of a single perforating gunshot wound to the head.

## H. Detective Miguel Franco

Detective Miguel Franco was employed by the sheriff's department and responsible for investigating Montgomery's death. Working with Nakamura, he determined which items would be of evidentiary value in processing the scene. Detective Franco also participated in the search of defendant's trailer. Defendant was not present. Defendant's mother had arrived at the trailer and when she received a call from

---

[14] The center of the entry wound was located one and one-half inch below the crown. The center of the exit wound was located one-half inch below the crown and two and one-half inches from the left midline, indicating an upward travel through the skull.

defendant's father, Allen Horsley, Sr. Detective Franco spoke with Horsley, Sr., on the phone and advised him that Detective Franco was looking for defendant. Detective Franco went to both defendant's mother's residence and Horsley, Sr.'s residence on November 3, but did not find defendant. Defendant was eventually arrested at 5:00 p.m. that day, after Horsley, Sr., notified Detective Franco that defendant was waiting for Detective Franco at defendant's mother's residence.

### I.        Allen Horsley, Sr.

Allen Horsley, Sr., is defendant's father. On November 23, at approximately 2:00 a.m., just after defendant shot Montgomery, defendant arrived at Horsley, Sr.'s house, crying and scared. Defendant handed him a plastic bag and said it contained a gun. Horsley, Sr., advised defendant to place the plastic bag into a sturdier bag. After doing so, defendant gave the bag to Horsley, Sr., and asked him to hold it for defendant. Later, after the sun came up, Horsley, Sr., was in contact with Detective Franco to coordinate defendant turning himself in to the police.

Almost three weeks later, on November 22, Horsley, Sr., contacted Sergeant McBride, at defendant's request, to turn the gun over. Horsley, Sr., testified that he claimed not to know the contents of the bag because he had not actually looked inside it. He admitted that although he had spoken to and met with several detectives the day defendant was arrested, he never told them he had the firearm or gave the gun to the detectives.

Horsley, Sr., testified that he did not look inside the bag, but that he knew the gun was dismantled because he asked defendant to dismantle it and watched defendant, Labeef, and Corbitt do so. Horsley, Sr., demanded that defendant dismantle the gun after he saw defendant put the gun to his head because defendant was scared that he would never see his children again. Horsley, Sr., testified that he knew how to destroy the gun if he wanted to hide it.

### J. Detective Lewis Trevino

Detective Lewis Trevino worked in the cyber and forensics unit of the sheriff's department. In investigating Montgomery's murder, Detective Trevino determined that the trailer park did not have an operable surveillance system. However, he acquired video recordings from the store near the trailer park from midnight November 2 until 1:30 a.m. on November 3. Detective Trevino also participated in executing a search warrant on the bag that Horsley, Sr., had turned over. The bag contained a dismantled firearm, magazine, seven rounds of .45-caliber ammunition, and a holster with a belt clip.

### K. Sergeant Daniel McBride

Sergeant Daniel McBride,[15] employed by the sheriff's department, responded to the trailer park the morning of Montgomery's murder. Upon arriving, he recorded interviews with VanTassel and Riley, who both appeared very upset. Several hours later, Chatten arrived and Sergeant McBride also recorded her interview. Sergeant McBride learned that defendant was connected to the Visalia Sportsmen's Association and interviewed Russell Beechinor. Sergeant McBride responded to the location were Labeef was contacted and authored a search warrant for Corbitt's vehicle, which was parked there. Sergeant McBride also attended Montgomery's autopsy. Montgomery was five feet eight inches tall and had a thin build.[16]

On November 3, Sergeant McBride was in contact with Horsley, Sr., but Horsley, Sr., never indicated he possessed defendant's firearm. Thereafter, on November 22, Horsley, Sr., contacted Sergeant McBride and Sergeant McBride met with him. Horsley, Sr., told Sergeant McBride that defendant had arrived at his house between 2:30 a.m. and 3:00 a.m. on November 3. Horsley, Sr., told Sergeant McBride that defendant handed

---

[15]    At the time of the shooting, Sergeant McBride was a detective in the sheriff's department homicide unit.

[16]    During cross-examination, Sergeant McBride testified that defendant was five feet nine inches tall.

Horsley, Sr., something and asked him to hold it and take care of it. Horsley, Sr., did not remember what defendant handed him. Horsley, Sr., told Sergeant McBride that he went to bed after receiving the item and did not know when defendant left the house. After several days, Horsley, Sr., remembered that defendant had given Horsley, Sr., something, and he looked for it. He found a bag in his bedroom that "clinked." He contacted defendant's attorney and was advised to turn the bag over to the police. Sergeant McBride received the bag from Horsley, Sr. He told Sergeant McBride that he did not know what was in the bag and had not looked inside. Horsley, Sr., never told Sergeant McBride that the bag contained a firearm.

After receiving the bag, Sergeant McBride assisted Detective Trevino in executing a search warrant to examine it. Sergeant McBride found a dissembled model 1911 semiautomatic firearm inside the bag.[17] The only reason to dissemble a weapon would be to clean it or take it apart to attempt to dispose of it. The firearm was registered to defendant.

Sergeant McBride testified that the surveillance videos from the store showed VanTassel, Labeef, and Corbitt inside at time stamp 23:41. However, this was likely behind the actual time by one hour given that Montgomery was shot just after leaving the store and the 911 call was made just before 1:00 a.m. The individuals were likely in the store at 12:41 a.m. and not 11:41 p.m. Defendant was recorded inside the store earlier with Labeef at time stamp 20:39 (9:39 p.m. adjusting for the inaccuracy of the time stamp) and again at time stamp 21:57 (10:57 p.m. adjusting for the inaccuracy of the time stamp).

---

**17** The parties stipulated that defendant had in his possession and used the firearm during the homicide of Montgomery.

15.

## L. Jessica Winn

Jessica Winn worked as a senior criminalist for the California Department of Justice Bureau of Forensic Services. Her duties included working in the firearm and toolmark examination section. She received the firearm parts that Horsley, Sr., provided to the sheriff's department. Winn reassembled the parts. She fired the firearm with and without ammunition and determined that the firearm operated according to the manufacturer's design.

The model 1911 firearm is designed with two safety features, defined as features either internal or external, to prevent firing the firearm unintentionally by blocking the internal parts. The firearm has a grip safety and a switch safety. Both safeties must be disengaged for the firearm to fire. In addition, the firearm has a hammer which has to be cocked or disengaged before the gun can fire. For the first round fired, the hammer is cocked manually or by pulling back the slide. After the first shot, recoil energy of the firearm will cause the slide to go back and cock the hammer. Finally, the trigger must be pulled before the firearm will fire. The trigger has a guard that prevents a finger or object from accidentally pushing back the trigger.

Winn performed several tests to determine whether the firearm could have fired by accident. One such test determines the amount of pressure needed to pull the trigger. The firearm used to kill Montgomery needed four and one-half pounds of pressure to pull the trigger (less than the six pounds used to open a soda can). Winn also conducted two tests to determine whether the firearm could be fired accidentally. With the hammer cocked and both safeties engaged, the firearm was dropped several times (on its side, on the hammer, on the barrel, on the bottom) but the hammer did not release, and the firearm did not fire. Next, Winn conducted a "jar-off" test whereby she depressed the grip safety, disengaged the switch safety, and cocked back the hammer. She then forcibly tried to push the hammer, by hand and with a mallet, but the hammer did not release, and the firearm did not fire.

**M.     Russell John Beechinor**

Russell John Beechinor was a member of the Visalia Sportsmen Association, in charge of range operations, and knew defendant from that membership.  Beechinor was responsible for training range safety officers as to gun safety and safe gun handling.  Range safety officers check people in and out of the range, ensure they are using the correct ammunition, and ensure members are safely handing firearms as they move to the firing line and shoot.

To become a range safety officer, a member must take an eight-hour class, participate in three days of training, and pass a written test.  Members are instructed to assume the gun is always loaded and point the firearm up and never at anyone.  Defendant was a range safety officer at the Visalia Sportsman Association for approximately two years.

## II.     *Defendant's testimony.*

Defendant testified that the night Montgomery was killed, Chatten came to see him.  He had lived in the trailer park near her for more than a year.  Chatten was talking with Labeef and Corbitt when defendant joined them outside.  Chatten said that someone was at her trailer and would not leave.  She asked defendant to come to her trailer and talk to the individual.  Before doing so, defendant and Labeef went to the store, but defendant stayed in the back seat of the car talking with Corbitt and he did not know that VanTassel and Montgomery were also at the store.  Defendant did not know Montgomery.

When they left the store, Corbitt parked near Chatten's trailer because that space was available.  Defendant saw a blue car (Montgomery's car) but did not pay it any attention.  Defendant and Labeef approached Chatten's trailer to ask her what was happening.  Labeef talked with Chatten who cried and said Montgomery needed to leave.

17.

Defendant testified that he took the gun with him to the store because it was late at night. Labeef, Corbitt, and defendant planned on visiting Chatten after going to the store but did not know if the person she was worried about was still there. Chatten pointed to Montgomery and said he needed to leave. Defendant saw Montgomery standing near the open door of his car. Defendant walked around the car door, with his back to the trunk, and faced Montgomery. Defendant told Montgomery that he needed to leave. Montgomery got really hostile and said, "What the fuck, bro. I don't have to leave. Who are you?" Defendant told Montgomery that Chatten asked defendant to ask Montgomery to leave because her grandson was sleeping. Montgomery was angry and said that he did not have to leave and he was not a weirdo. Defendant told him no one was calling him a weirdo but that he just had to leave. Montgomery was "real jumpy and antsy" and said, "I'm gonna fucking stay. If you don't like it, then fuck you."

Defendant testified that he "was getting more scared." Montgomery said, "I don't have to go no more. If you got a fucking problem, then we can run that fade dog." Defendant explained that the expression "run that fade" meant Montgomery wanted to fight. Defendant started "backing away from [Montgomery] because he was getting more mad. He lunged at me. He made an aggressional [sic], like just jolted at me." (First bracketed insertion added.) Defendant backed against the side of the car and "[Montgomery] lunged at me like that. It scared me. I got, like, really scared. Like, I just backed up a little more. And he said, 'So what's up pussy?' " Montgomery started "making steps. I didn't want him to hurt me, like, to strike me. So my reaction, all I did was from my right-hand side, I drew my pistol out, just to scare him." Defendant is a left-handed shooter and carries his gun on his right-hand side, in his waistband.

Defendant testified he "usually [used the gun] for home protection, but that night I just took it with me because I didn't know what type—what I was really walking—I just took it for my protection." He normally kept the gun in a box, loaded with one round of ammunition in the chamber and the hammer not cocked.

18.

Defendant did not have the switch safety engaged when he pulled out the gun. Defendant had no intention to hurt or shoot Montgomery, defendant just wanted to scare Montgomery. Defense counsel asked, "Could you tell whether [Montgomery] saw it?" Defendant testified, "As soon as I drew it, he immediately attacked me." Defendant clarified, "He charged me.… [¶] … [¶] As soon as I drew out, he grabbed me and he pulled me into him. As he pulled me into him, I pulled away. As I pulled away, the weapon discharged." Defendant testified that Montgomery turned and fell on his back. Montgomery never tried to get back into his car. Defendant got scared, panicked, and ran. Defendant, Labeef, and Corbitt returned to Corbitt's car, and Corbitt drove away.

While in the car, they all screamed at each other, and defendant screamed, "I didn't pull that trigger." Defendant had Corbitt drive to Horsley, Sr.'s house, and defendant pounded on Horsley, Sr.'s door. Horsley, Sr., let them inside. Defendant told Horsley, Sr., what happened, that defendant drew the gun out of fear and that it discharged as he pulled away from Montgomery. Defendant felt so bad that he took the gun to the bathroom with him and intended to shoot himself. Horsley, Sr., found defendant and stopped him. Horsley, Sr., instructed him to disassemble the gun. Defendant placed the parts in the bags and gave them to Horsley, Sr. Defendant intended to turn the gun into the police and did not intend to hide it. When he turned himself in, defendant did not have time to tell the police about the gun. He testified that he knew how to destroy the gun if he wanted to do so, but he did not.

On cross-examination, defendant testified that Chatten was very upset and crying when he spoke to her, and she said that she was scared. Although Chatten was scared, defendant did not know if Montgomery was still at her trailer and decided to go to the store before going to Chatten's trailer. Defendant armed himself because of the late hour and because he "live[d] in a hostile environment," but acknowledged that he did not take his gun the other two times he went to the store that evening. He did not check the

19.

weapon before placing it into his waistband and did not know if the gun was cocked. He believed that it was not cocked.

When Labeef went into the store, defendant stayed in the car and talked with Corbitt. When they returned to the trailer park, Corbitt parked close to Chatten's trailer and not defendant's trailer. Chatten was outside yelling, "You need to leave." Chatten pointed to Montgomery and defendant approached Montgomery "in a polite manner." Montgomery was still sitting in his car when defendant said, "Hey bro, you need to leave." Montgomery then got out. Defendant got out when Montgomery "flinched" at him and taunted him. Montgomery screamed and yelled at defendant and called him a "pussy." When Montgomery said, "what's up pussy," and approached him, defendant feared that Montgomery would assault him or hit him.

Defendant testified that he did not pull out the gun and place it to Montgomery's head. Montgomery did not swat the gun out of defendant's hands. The gun never landed on the hood of the car, and Montgomery did not try to leave. Defendant testified that he was never standing by the hood of the car, he was standing by the trunk of the car. He denied shooting Montgomery because Montgomery had disrespected defendant in front of his friends, "That is not what happened. I acted out of fear, ma'am."

Defendant testified that he feared Montgomery after Montgomery said, "What do you want to do, pussy? What's up?" and tried to fight defendant because Montgomery "was acting like a deranged maniac." Defendant did not feel that he might die but thought he would be beat up. Defendant testified, "I didn't draw the weapon to shoot or anything, ma'am. I drew it just to simply[,] out of fear[,] to scare him to leave me alone and not approach me." Defendant thought he was going to be beat up and harmed. Montgomery taunted defendant and defendant moved away from the car, towards the

20.

trunk because he was scared. The prosecutor asked, "Okay. Just so I can understand this. So it was at that point you testified that he then attacked you?" Defendant testified:

> "… Because he started calling me, 'What's up pussy? You want to run that?'

> "And I was like, 'Look, man, I'm not trying to fight you.'

> "And he goes, 'It's not even that way.'

> "And he said, 'Well, it fucking seems that way.' I drew out of fear. Not to use the weapon or any such, ma'am. I only drew. [¶] … [¶]

> "… I drew. As I was drawing, he attacked me. He grabbed me, and he pulled me into him. As he pulled me into him, I held on tight and I pulled away and the gun discharged."

Defendant demonstrated that his hands started at his waist, pulling the gun from his right side, and he pulled away from Montgomery after Montgomery grabbed him, his hands went up and away, and the gun discharged. Defendant testified that the switch safety was not engaged at the time because he never engaged it as the gun is usually stored in a lock box at home. When the prosecutor asked whether it was dangerous to carry the gun in his pants without the switch safety engaged, defendant testified that he relied upon the grip safety.

According to defendant, after the gun fired, Montgomery turned and fell "straight on his back." Defendant did not know if Montgomery was injured, but he panicked and ran. While driving away, defendant told Corbitt and Labeef that they should go back, but they believed that Montgomery had been shot. Once defendant arrived at Horsley, Sr.'s house, he thought his life was over because he shot Montgomery. Defendant testified that the gun fired when Montgomery attacked him.

21.

## DISCUSSION

### I.  *Any error in the trial court's instructions on self-defense was harmless.*

#### A.  Background[18]

The trial court instructed the jury on homicide with CALCRIM Nos. 500 ("Homicide: General Principles"), 505 ("Justifiable Homicide: Self-Defense"), 510 ("Excusable Homicide: Accident"), 520 ("First or Second Degree Murder With Malice Aforethought"), 521 ("First Degree Murder"), 522 ("Provocation: Effect on Degree of Murder"), 571 ("Voluntary Manslaughter: Imperfect Self-Defense—Lesser Included Offense"), and 570 ("Voluntary Manslaughter: Heat of Passion—Lesser Included Offense").  (Boldface omitted.)

The court instructed the jury that a homicide was lawful and no crime is committed if defendant had a legally valid excuse or justification.  If defendant did not, he is guilty of murder or manslaughter.  (See CALCRIM No. 500).  Pursuant to CALCRIM No. 505, the trial court instructed the jury:

> "[D]efendant is not guilty of murder if he was justified in killing someone in self-defense.  [D]efendant acted in lawful self-defense if, one, [] defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury; two, [] defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger; and, three, [] defendant used no more force than was reasonably necessary to defend against that danger."

In addition, the trial court instructed that the belief must have been reasonable, defendant acted only because of that belief, and defendant used only the amount of force a reasonable person would believe necessary.

---

**18**  The trial court record does not contain any information regarding the process of selecting the jury instructions.  The parties did not file written requests for jury instructions and the trial court did not record the jury instruction conference.

22.

Pursuant to CALCRIM No. 510, the trial court instructed:

"[D]efendant is not guilty of murder if he killed someone as a result of accident or misfortune. Such a killing is excused and not unlawful if, one, [] defendant was doing a lawful act in a lawful way; two, [] defendant was acting with usual and ordinary caution; and, three, [] defendant was acting without any unlawful intent."

The trial court further instructed the jury that if they found defendant guilty of first degree murder, the jury was required to decide if defendant personally used a firearm by intentionally discharging it and causing death pursuant to CALCRIM No. 3150 ("Personally Used Firearm: Intentional Discharge and Discharge Causing Death [boldface omitted]"):

"To prove that [] defendant intentionally discharged the firearm, the People must prove that, one, [] defendant personally discharged the firearm during the commission of that crime; two, [] defendant intended to discharge the firearm."

The trial court also instructed the jury on assault with a firearm using CALCRIM No. 875 ("Assault with Deadly Weapon or Force Likely to Produce Great Bodily Injury [boldface omitted]"):

"To prove [] defendant is guilty of this crime, the People must prove that, one, [] defendant did an act with a firearm that by its nature would directly and probably result in the application of force to a person; two, [] defendant did the act willfully; three, when [] defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would probably and directly result in the application of force to someone; four, when [] defendant acted, he had the present ability to apply force with a firearm to a person; and five, [] defendant did not act in self-defense."

The trial also instructed with CALCRIM Nos. 915 ("Simple Assault"), 3471 ("Right to Self-Defense: Mutual Combat or Initial Aggressor"), 3472 ("Right to Self-Defense: May Not Be Contrived"), and 3474 ("Danger No Longer Exists or Attacker Disabled"). (Boldface omitted.)

23.

The trial court did not instruct the jury on self-defense pursuant to CALCRIM No. 3470, the self-defense instruction describing the elements applicable to nonhomicide offenses. Accident as a defense to murder requires the jury to find that defendant was engaged in a lawful act (self-defense) in a lawful way (using the firearm). Defendant argues that the trial court erred by instructing the jury as to self-defense for homicide because he was not asserting that as a defense, and also erred in failing to instruct on the elements of self-defense in nonhomicide cases as to the assault with a firearm charge. Defendant claims these errors prevented the jury from finding his display of the firearm was lawful self-defense when it accidentally discharged.

We reject defendant's argument on the merits for several reasons as discussed below. In addition, we ultimately conclude that the jury's finding that defendant personally used a firearm by intentionally discharging it renders any alleged error harmless because it demonstrates that the jury rejected defendant's testimony that he accidentally discharged the firearm when he killed Montgomery.

### B.   Standard of Review and Applicable Law

We review claims of instructional error de novo. (*People v. Rivera* (2019) 7 Cal.5th 306, 326.) In doing so, we are required to review the evidentiary support for giving an instruction " 'in the light most favorable to the defendant' [citation] and … resolve doubts as to the sufficiency of the evidence to warrant instructions ' "in favor of the accused." ' " (*People v. Wright* (2015) 242 Cal.App.4th 1461, 1483.) We consider the failure to give an instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instructions given in a manner inconsistent with the law. (See *Rivera*, at p. 326; *People v. Mason* (2013) 218 Cal.App.4th 818, 825; *People v. Burgener* (1986) 41 Cal.3d 505, 538 [" 'The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole.' "], disapproved on another ground in *People v. Reyes* (1998) 19 Cal.4th 743, 756; *People v. Chavez* (1985) 39 Cal.3d 823, 830 ["we

24.

must look to the entire charge, rather than merely one part, to determine whether error occurred"].)  In doing so, we assume that " ' "jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." ' " (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1321, abrogated on another ground as stated in *People v. Hardy* (2018) 5 Cal.5th 56, 100.)  "Where reasonably possible, we interpret the instructions ' "to support the judgment rather than [to] defeat it." ' " (*Mason*, at p. 825.)[19]

### C.    Analysis

#### 1.    *The trial court properly instructed the jury regarding self-defense pursuant to CALCRIM No. 505.*

##### a)    Defendant did not defend against the assault with the firearm charge based upon self-defense.

Defendant argues that the assault charge was based on the act of pulling out the firearm just before he shot Montgomery.  He claims to have presented a self-defense claim to defend against the charge and relied upon accidental discharge as a defense to the discharge of the firearm that forms the basis of the murder charge.  Defendant contends the court erred, therefore, in not instructing the jury as to CALCRIM No. 3470.  The record demonstrates that the act of pulling the firearm just as it discharged is not the

---

[19]    There is no record of defendant objecting to the trial court's failure to instruct the jury with CALCRIM No. 3470 as to the charge of assault with a firearm, and the ordinary rule is he was required to object to preserve the issue for appeal.  (*People v. Bolin* (1998) 18 Cal.4th 297, 326.)  But as the court's failure to instruct with CALCRIM No. 3470 could be viewed as having lessened the prosecution's burden to prove he did not act in self-defense—an element of the assault offense—and thus affected his substantial rights, we may review the claim despite his failure to object below.  (See §§ 245, 1259 ["The appellate court may also review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."]; *People v. Hillhouse* (2002) 27 Cal.4th 469, 503 [instructions regarding elements of the crime affect the defendant's substantial rights and require no objection for review]; *People v. Mackey* (2015) 233 Cal.App.4th 32, 106 [" 'a defendant need not object to preserve a challenge to an instruction that incorrectly states the law and affects his or her substantial rights' "].)

act underlying count 3, nor did defendant use self-defense as justification for putting the firearm to Montgomery's head. As the prosecutor argued to the jury:

> "Count 3 is assault with a firearm. And this is pertaining to when he first—when [] defendant first confronted [Montgomery] and held the gun to his head. So what the judge instructed you was to prove this beyond a reasonable doubt, I must prove that [] defendant did an act with a firearm. That by its nature would directly and probably result in the application of force to a person. That's the holding a loaded firearm to someone's head. [¶] … [¶] And [] defendant did not act in self-defense."

VanTassel testified that Labeef and Defendant approached Montgomery before Montgomery had even addressed them. Labeef told Montgomery to leave, Montgomery objected to Labeef's order, and defendant, while standing next to Labeef, pulled a gun with his left hand and put it to Montgomery's temple. Montgomery, using his right hand, slapped the gun out of defendant's hands and grabbed his throat, causing the gun to fall onto the center of the hood of Montgomery's car. Montgomery let defendant go and started to get into his car when VanTassel told Montgomery, "[D]on't, don't. Let him go. Go home. Go get in the car and go home." At this point, after defendant apparently retrieved the firearm from the car's hood, defendant shot Montgomery in the head. The prosecutor argued that defendant shot Montgomery because Montgomery disrespected defendant by disarming him of the firearm.

The prosecutor's argument described defendant's act of placing the gun to Montgomery's head as the basis for the assault charge and argued VanTassel's testimony was corroborated by Riley's testimony that she heard Montgomery tell someone, "Get that out of my face." The prosecutor argued that defendant assaulted Montgomery with a firearm by placing the firearm against his head at that time:

> "Again, we have a gun to a head. This is a clear example of what an assault with a firearm is. [¶] … The fact he held the gun to his head, again, is enough. [¶] … So at that very moment if [defendant] didn't intend to pull the trigger, it doesn't matter for assault with a deadly weapon. At that time, again, holding the gun to his head, he's guilty of assault with a firearm."

26.

Regarding the enhancement for count 3, the jury was instructed that defendant personally used a firearm if he intentionally displayed the firearm in a menacing manner. The prosecutor argued that "holding a gun to someone's head is surely displaying it in a menacing manner."[20]

During cross-examination, defendant did not claim that he placed the gun against Montgomery's head in self-defense. Defendant denied it happened. He testified that he did not pull out the gun and place it to Montgomery's head. Defendant denied that Montgomery swatted the firearm out of defendant's hand. Defendant testified that the gun never landed on the hood of the car and Montgomery was not trying to leave in his car when the firearm discharged. Defendant testified that he was never standing by the hood of the car, he was standing by the trunk of the car. He denied shooting Montgomery because Montgomery had disrespected him in front of his friends and stated, "That is not what happened. I acted out of fear, ma'am."

The record establishes that, as to the charge of assault with a firearm, defendant denied that he put the firearm to Montgomery's head as charged in count 3. His current argument on appeal is inconsistent with his defense at trial. Defense counsel did not even address the assault charge in his closing argument.

Defendant's argument on appeal that he did not use self-defense to defend against the murder charge is also not supported by the trial record. Defense counsel argued in closing that defendant was not guilty of murder both because the gun discharged by accident and because defendant acted in self-defense fearing great bodily injury. Defense counsel argued that if the jury did not agree that defendant needed to defend himself, he

---

[20] The prosecutor also argued at sentencing against staying the sentence on the assault charge pursuant to section 654 because count 3 regarded the first time defendant pointed the firearm at Montgomery and not the time when it was fired, "prior to shooting [Montgomery] in the head, [] defendant first approached [Montgomery] with a gun, held it to his temple. That's when [Montgomery] swatted the gun away, landed on the hood of the car.… [¶] … So we have charged that as a separate act.… That's why we added the charge in the amended information."

27.

then would not be guilty of murder but would be guilty of voluntary manslaughter. "That's what this case, in my opinion, really comes down to, is whether or not [defendant] acted with reasonable or unreasonable belief in self-defense, or if it was done by an accident." Defense counsel also argued:

> "The real question I think is whether or not [defendant] was reasonable or unreasonable in believing he needed to defend himself against [Montgomery]. That's a decision for you to make once you're weighing all the evidence. Was this accidental? Do people pull out weapons for the sole purpose of killing people with it? Or do they brandish it to scare someone off? That's equally reasonable. [¶] Dude, run. I got something here to protect myself with. That's reasonable to brandish it, to scare somebody, except in this scenario, [Montgomery] wasn't scared." [¶] … [¶] Hopefully when you think about this, you'll see where the doubt really exists. You'll return the appropriate verdicts, either lawful reasonable self-defense, unreasonable self-defense, which is a manslaughter."

Based upon this record, we cannot conclude that the trial court erred in instructing the jury pursuant to CALCRIM No. 505 ("Justifiable Homicide: Self-Defense") rather than CALCRIM No. 3470 ("Right to Self-Defense or Defense of Another (Non-Homicide)"). (Boldface omitted.)

> **b)**      **Given the facts of this case, the trial court was required to instruct as to self-defense for the murder charge.**

Defendant argues that because he was defending against the murder charge by claiming the gun fired accidentally, it was error for the trial court to instruct the jury as to self-defense as well. As we discussed above, this appellate argument is inconsistent with defense counsel's closing argument of self-defense to justify the shooting and imperfect self-defense to reduce the charge to voluntary manslaughter. In addition, we conclude the trial court was required to instruct on self-defense because the facts of this case would permit the jury to disregard defendant's claim of accident but still find that defendant acted in self-defense.

28.

Case law is clear that substantial evidence of self-defense can exist in a case where the defendant has affirmatively testified that the shooting was accidental. (*People v. Villanueva* (2008) 169 Cal.App.4th 41, 52.) A defendant's assertion of accident may be disregarded by the jury in an appropriate case and will not foreclose a jury instruction on self-defense when there exists substantial evidence that the shooting was intentional (and met the other requirements of self-defense). (*People v. Barton* (1995) 12 Cal.4th 186, 202–203 [finding sufficient evidence of intentional shooting in imperfect self-defense despite the defendant's assertion that the shooting was accidental]; *People v. Elize* (1999) 71 Cal.App.4th 605, 610 ["A jury … could disbelieve defendant's testimony that the firing was accidental, and decide instead that he had fired intentionally, either actually attempting to hit one of the [assailants] or to shock them into breaking off their attack."]; *People v. Curtis* (1994) 30 Cal.App.4th 1337, 1354–1355; *People v. Mayweather* (1968) 259 Cal.App.2d 752, 755–756 [jury could have found a volitional shooting in self-defense despite the defendant's assertion of accident].)

The trial court has a duty to instruct on a defense where there is substantial evidence to support it and the defense is not inconsistent with the defendant's defense. (*People v. Breverman* (1998) 19 Cal.4th 142, 157.) In this case, defendant did not object to the jury instructions read by the trial court, and the jury instruction was consistent with defendant's closing argument.

Here, defendant testified that he did not provoke Montgomery. Montgomery yelled and screamed at defendant, stated that he intended to fight defendant, and acted like a deranged maniac. Defendant, believing that he would be harmed and beat up, drew his firearm just as Montgomery lunged, and the gun fired accidentally. The prosecutor introduced evidence that the firearm would not have gone off accidentally, but the jury could still consider whether defendant's use of the firearm was justified by the belief that he would be harmed or, if such was belief was not reasonable, whether it nonetheless reduced the crime to voluntary manslaughter.

29.

Given this record, we cannot conclude that the trial court erred in instructing the jury that self-defense was a defense to the murder charge.[21]

### 2. *The trial court instructed the jury that defendant was not guilty of assault with a firearm if he acted in self-defense and the instructions were sufficient as a whole.*

But even if defendant were relying on self-defense to the charge that he deliberately placed a gun to Montgomery's head, we believe the instructions given were sufficient to explain the prosecutor's burden to prove defendant did not act in self-defense. The trial court's instructions to the jury explained that for defendant to be guilty of the assault charge, the prosecutor was required to prove beyond a reasonable doubt that "defendant did not act in self-defense." (CALCRIM No. 875.) In the context of the murder charge, the court instructed that "defendant is not guilty … if he was justified in killing someone in self-defense." (CALCRIM No. 505.) The instruction defined self-defense, largely mirroring CALCRIM No. 3470. Defendant argues that CALCRIM No. 505 was insufficient in relation to the assault charge because it limited itself to the murder charge. But we find nothing in the instruction that limits it to the murder charge. CALCRIM No. 505 explains that self-defense is a defense to murder but in explaining the elements of self-defense, it does not limit itself to murder. CALCRIM No. 875 instructed the jury that the prosecutor had to prove defendant did not act in self-defense and a reasonable jury would use the definition in CALCRIM No. 505 in making that decision.

The trial court also instructed the jury pursuant to CALCRIM No. 3471, which again impressed upon the jury that the prosecutor had to disprove defendant acted in self-defense. The court further instructed pursuant to CALCRIM No. 505 that, in order to

---

[21]    We also note that the bench notes to CALCRIM No. 3471 state, "If the defendant was the initial aggressor and is charged with homicide, always give CALCRIM No. 505, *Justifiable Homicide: Self-Defense or Defense of Another*, in conjunction with this instruction." (Judicial Council of Cal., Crim. Jury Instns. (2020) Bench Notes to CALCRIM No. 3471, pp. 1112–1113.)

have acted in self-defense, defendant was permitted only "to use that amount of force that a reasonable person would [have] believe[d] ... necessary in the same situation," and, pursuant to CALCRIM No. 3474, "[t]he right to … self-defense … continue[d] only as long as the danger exist[ed] or reasonably appear[ed] to [have] exist[ed]. [¶] When the attacker withdr[ew], … the right to use force end[ed]."

Together, these instructions correctly conveyed the law of self-defense. (See *People v. Minifie* (1996) 13 Cal.4th 1055, 1064–1065 [use of force in self-defense must be in response to "imminent" threat of bodily injury and must be "limited to the use of such force as is reasonable under the circumstances"].) Viewing the instructions as a whole, even without considering the omitted CALCRIM No. 3470 instruction, we conclude there is no reasonable likelihood the jury believed the prosecutor was not required to prove beyond a reasonable doubt that defendant did not act in self-defense to find him guilty of assault and was instructed on the elements of self-defense. In light of all of the instructions given, the trial court's failure to instruct the jury with CALCRIM No. 3470 was not an error because there is no reasonable likelihood the jury erroneously applied the law.[22]

### 3. Any error in the jury instructions relating to accident was harmless.

Defendant argues that he pulled out the firearm during his argument with Montgomery in self-defense because he feared that Montgomery would assault him and that the firearm accidentally discharged when they struggled. He argues we must reverse the conviction on the assault charge due to the failure to instruct on CALCRIM No. 3470. He also argues that this error prejudiced his accident defense as to the murder charge because the jury could not find that he was performing a lawful act (pulling out the firearm in self-defense) in a lawful way without any unlawful intent. (See CALCRIM

---

[22]     Our conclusion similarly disposes of defendant's claim that defense counsel was ineffective in failing to request CALCRIM No. 3470 or failing to object to CALCRIM No. 505.

No. 510.) Even if we conclude that the trial court erred in not instructing as to CALCRIM No. 3470, we conclude omission of the instruction was harmless beyond a reasonable doubt.

"Omission of an instruction is harmless beyond a reasonable doubt if ' "the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions." ' " (*People v. Lujano* (2017) 15 Cal.App.5th 187, 195–196, quoting *People v. Wright* (2006) 40 Cal.4th 81, 98.)  For state law instructional error, harmlessness is reviewed under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836–837.  (*People v. Flood* (1998) 18 Cal.4th 470, 483 & fn. 9.)  Reversal is warranted if "there is a 'reasonable probability' there would have been a result more favorable to the defendant absent the error." (*Id*. at p. 483.)  When a defendant claims instructional error based on a failure to give a necessary instruction, we apply the harmless beyond a reasonable doubt standard in *Chapman v. California* (1967) 386 U.S. 18, 24.  (*People v. Aledamat* (2019) 8 Cal.5th 1, 7–9.)  Under that standard, we "must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Id*. at p. 3.)

As to the assault with a firearm charge, defendant testified that he did not commit the act underlying count 3, that is, pulling the gun out and placing it to Montgomery's head.  If the jury believed defendant's testimony that he never put the gun to Montgomery's head, the failure to instruct on self-defense was harmless.  In addition, having concluded that the jury was adequately instructed regarding the assault with a firearm charge, the failure to also instruct on CALCRIM No. 3470 was harmless beyond a reasonable doubt and does not require reversal of count 3.

We also conclude that the failure to instruct with CALCRIM No. 3470 was harmless with respect to any effect on defendant's accident defense to the murder charge.  First, the court instructed the jury that defendant would be guilty of first degree murder if

32.

they found that he acted willfully, deliberately, and with premeditation. (See CALCRIM No. 521.) "Willfully" was defined as intending to kill, "deliberately" was defined as a decision to kill after weighing the considerations for and against that choice, and "premeditation" was defined as the decision to kill was made before completing the act that caused death. (CALCRIM No. 521.) By returning a verdict of guilty as to first degree murder, the jury necessarily rejected defendant's testimony that he discharged the firearm accidentally.

In *People v. Jones* (1991) 234 Cal.App.3d 1303, overruled on another ground by *People v. Anderson* (2011) 51 Cal.4th 989, 998, footnote 3, the jury convicted Jones of attempted premeditated murder after he suddenly opened his car door during a traffic stop and pointed a shotgun at a deputy sheriff's head. (*Jones*, at pp. 1306, 1308.) Jones claimed that the shotgun discharged accidentally when the deputy made a sweeping motion with his left hand to try to knock the shotgun barrel away. (*Id*. at pp. 1309–1309.) The trial court failed to instruct on the defense of accident and misfortune. (*Id*. at p. 1313.) While the court found this to be error,[23] the court found the error was harmless beyond a reasonable doubt because "*other* proper instructions adequately guide[d] the jury in reaching factual determinations on those issues which would have been presented to the jury by the omitted instruction." (*Jones*, at p. 1314.) "Willfully" having been defined as "intentionally," and the jury having found Jones acted willfully, the court found "it [was] clear, beyond credible argument, that the jury necessarily rejected the evidence … that would have supported a finding to the effect that [Jones]'s 'accident and misfortune' defense … was valid, thus implicitly resolving the question of that defense

---

[23]    *Anderson* overruled *Jones* and held that a trial court is not required to instruct as to accident sua sponte, but only upon request by the defense to negate the intent or mental element of a charged crime. (*People v. Anderson*, *supra*, 51 Cal.4th at p. 998, fn. 3.)

adversely to [Jones]." (*Id*. at pp. 1315–1316.) Likewise, if there was any error here, it was harmless beyond a reasonable doubt for the same reason.

In addition, the trial court instructed the jury that to prove defendant intentionally discharged a firearm, the People must prove that defendant personally discharged the firearm and that he intended to do so. (See CALCRIM No. 3150.) The jury found this allegation had been proven, demonstrating that the jury rejected defendant's accident defense because it found defendant intended to fire the weapon. Based on finding the firearm enhancement true, the jury necessarily found that defendant intentionally fired his gun, negating any claim of an accidental discharge. Therefore, any error in not instructing the jury with CALCRIM No. 3470 on the assault charge and any subsequent effect on defendant's accident defense to the murder charge was clearly harmless beyond a reasonable doubt. (*Chapman v. California*, *supra*, 386 U.S. at p. 24.)

Accordingly, defendant was not prejudiced by the trial court's failure to instruct the jury as to CALCRIM No. 3470.

## II.    *The trial court did not err in responding to the jury's question regarding provocation.*

### A.    Background

As set forth above, the trial court instructed the jury on homicide with CALCRIM Nos. 500 ("Homicide: General Principles"), 520 ("First or Second Degree Murder With Malice Aforethought"), 521 ("First Degree Murder"), 522 ("Provocation: Effect on Degree of Murder"), and 570 ("Voluntary Manslaughter: Heat of Passion—Lesser Included Offense"). (Boldface omitted.) The jury was instructed that if they found defendant guilty of murder, it was murder of the second degree unless they found beyond a reasonable doubt that defendant acted willfully, deliberately, and with premeditation. The instruction explained that defendant must have intended to kill (willfully), after weighing the considerations for and against that choice and making a decision to kill (deliberately), and decided to kill before completing the act (premeditation). (CALCRIM

34.

No. 521.) If these requirements are not met, defendant is guilty of second degree murder. The instruction also explained, "A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." (*Ibid*.)

The jury was also instructed that provocation may reduce a murder from first degree to second degree or to manslaughter. (See CALCRIM No. 522.) If the jury concluded that defendant committed murder, they could consider whether defendant was provoked in determining the degree of murder or whether defendant committed manslaughter, with the weight and significance of the provocation left to them to decide. (*Ibid*.)

The voluntary manslaughter instruction informed the jury that a killing that would otherwise be murder is reduced to voluntary manslaughter if defendant killed someone because of a sudden quarrel or in the heat of passion. (See CALCRIM No. 570.) The instruction also explained that defendant killed someone because of a sudden quarrel or in the heat of passion if (1) he was provoked; (2) as a result of the provocation, defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; and (3) the provocation would have caused the person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. (*Ibid*.)

During deliberations, the jury sent a written note: "Can we have more clarification on [CALCRIM Nos. ]521 [and] 522 about provocation?" During discussions on responding to the jury, defense counsel opined that the jury was inquiring about the impact of provocation and suggested that the court reread CALCRIM Nos. 521 and 522. The trial court agreed to seek clarification from the jury but was inclined to reinstruct with CALCRIM No. 570—the jury instruction that states that a killing that would otherwise be murder is reduced to voluntary manslaughter if defendant killed someone because of a sudden quarrel or in the heat of passion.

The court assembled the jury and the following discussion ensued:

"THE COURT: Good afternoon, ladies and gentlemen. You had two questions. I'm going to address the first one. 'Can we have more clarification on [CALCRIM Nos. ]521 and 522 about provocation?' Who is the jury foreperson? What did you mean regarding that?

"A JUROR: What we are looking for is description of provocation and what that means.

"THE COURT: The definition of provocation?

"A JUROR: I guess the different levels of provocation? Because it says on [CALCRIM No. ]522 that it can be first degree, first degree [*sic*], or manslaughter, depending on the level. So how do you determine what is enough for one person or the other?

"THE COURT: There really aren't levels of provocation. It's whether there is provocation and what that provocation means in terms of the degree of the crime."

Without objection, the court reread CALCRIM No. 570, the instruction on voluntary manslaughter, as follows:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if [] defendant killed someone because of a sudden quarrel or in the heat of passion.

"[D]efendant killed someone because of a sudden quarrel or in the heat of passion if, one, [] defendant was provoked; two, as a result of the provocation [] defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; and, three, the provocation would have caused the person of average disposition to act rashly and without due deliberation, that is from passion rather than from judgment.

"Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

"In order for heat of passion to reduce a murder to voluntary manslaughter, [] defendant must have acted under the direct and immediate influence of provocation, as I have defined it. While no specific type of

36.

provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

"It's not enough that [] defendant simply was provoked. [D]efendant is not allowed to set up his own standard of conduct. You must decide whether [] defendant was provoked, and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition in the same situation and knowing the same facts would have reacted from passion rather than from judgment.

"If enough time passed between the provocation and the killing for a person of average disposition to, quote, 'cool off' and regain his reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.

"The People have the burden of proving beyond a reasonable doubt that [] defendant did not kill as a result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find [] defendant not guilty of murder."

The trial court then asked, "Does that help at all? That talks more about provocation. Okay?" The record does not indicate a response from the jury to the trial court's question, but we can presume the court's response clarified the jury's question as no additional questions were posed and the trial court provided no additional response. Defense counsel did not object or seek additional instructions to the jury.

**B.    Standard of Review and Applicable Law**

A court also has "a general obligation to 'clear up any instructional confusion expressed by the jury.' " (*People v. Dykes* (2009) 46 Cal.4th 731, 802 (*Dykes*).) This obligation arises under section 1138, which provides that if deliberating jurors "desire to be informed on any point of law arising in the case, … the information required must be given" to them in court.

Thus, " '[w]hen a jury asks a question after retiring for deliberation, "[Penal Code] [s]ection 1138 imposes upon the court a duty to provide the jury with information the jury desires on points of law." [Citation.] But "[t]his does not mean the court must

always elaborate on the standard instructions." ' " (*People v. Lua* (2017) 10 Cal.App.5th 1004, 1016, first bracketed insertion added.)  Rather, if " 'the original instructions are themselves full and complete, the court has discretion … to determine what additional explanations are sufficient to satisfy the jury's request for information.' " (*Dykes*, *supra*, 46 Cal.4th at p. 802.)  On the other hand, "it is generally not acceptable for a trial court to 'merely repeat for a jury the text of an instruction it has already indicated it doesn't understand,' " and "the court 'must at least *consider* how it can best aid the jury.' " (*People v. Franklin* (2018) 21 Cal.App.5th 881, 887 (*Franklin*).)

In general, errors under section 1138 are reviewed for an abuse of discretion. (*People v. Lua*, *supra*, 10 Cal.App.5th at p. 1016.)  The abuse-of-discretion standard only applies to "the decision to provide [or not provide] further instructions in response to an inquiry." (*Franklin*, *supra*, 21 Cal.App.5th at p. 887, fn. 4.)  "If a supplemental instruction is given, … its correctness presents a question of law that we review de novo." (*Ibid*.)

In reviewing a claim that the court's instructions were incorrect or misleading, we must determine whether there is a reasonable likelihood the jury understood the instructions as asserted by the defendant. (*People v. Cross* (2008) 45 Cal.4th 58, 67–68.)  We consider the instructions as a whole and assume that the jurors are intelligent persons capable of understanding and correlating all jury instructions given. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)  We make our determination using the independent or de novo standard of review. (*Ibid*.)

### 1.  *Defendant forfeited this claim.*

"When the trial court responds to a question from a deliberating jury with a generally correct and pertinent statement of the law, a party who believes the court's response should be modified or clarified must make a contemporaneous request to that effect; failure to object to the trial court's wording or to request clarification results in forfeiture of the claim on appeal." (*Dykes*, *supra*, 46 Cal.4th at p. 802.)

To avoid forfeiture, defendant contends that the trial court's response was not a correct statement of the law. According to defendant, the jury instructions originally given describe different levels of provocation that can reduce first degree murder to second degree murder and second degree murder to manslaughter. This is not correct. The jury was told that all murder is second degree murder. (See CALCRIM No. 520.) Second degree murder is elevated to first degree murder only if the jury finds beyond a reasonable doubt that defendant acted willfully, deliberately, and with premeditation. (CALCRIM No. 521.) Provocation can reduce murder from first degree murder by preventing the jury from finding premeditation and deliberation because "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." (*Ibid.*)

Defendant's level of provocation does not determine whether the crime is first degree murder, second degree murder, or voluntary manslaughter. If defendant is provoked, the quality and nature of the provocation (whether a reasonable person would be provoked) determines whether the crime is second degree murder or voluntary manslaughter. Whether defendant is greatly provoked or slightly provoked would not affect that decision. Therefore, the trial court correctly responded, "There really aren't levels of provocation. It's whether there is provocation and what that provocation means in terms of the degree of the crime."

The trial court properly reread CALCRIM No. 570 to define the nature of the provocation that may reduce the charge from second degree murder to manslaughter. CALCRIM Nos. 521 and 522 instructed the jury to consider whether defendant's provocation prevented him from making a willful, premeditated, and deliberate decision to kill.

This informed the jury to determine whether defendant was provoked (second degree murder) and whether the nature and quality of the provocation was sufficient to reduce the crime to voluntary manslaughter. The jury had read CALCRIM Nos. 521 and

39.

522, as evidenced by their question, and was aware that first degree murder required premeditation and deliberation and that provocation was relevant to whether the crime was first or second degree murder because a defendant who acted rashly cannot be found to have acted with deliberation and premeditation.

CALCRIM No. 570 defines the crime of voluntary manslaughter based on heat of passion. The Supreme Court has held that the instruction is not ambiguous. (*People v. Beltran* (2013) 56 Cal.4th 935, 954.) In *Jones*, the reviewing court analyzed CALCRIM Nos. 522 and 570:

> "[CALCRIM Nos. 522 and 570] accurately inform the jury what is required for first degree murder, and that if the defendant's action was in fact the result of provocation, that level of crime was not committed. CALCRIM Nos. 521 and 522, taken together, informed the jurors that 'provocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation.' [Citation.] As the jury also was instructed, a reduction of murder to voluntary manslaughter requires more. It is here, and only here, that the jury is instructed that provocation alone is not enough for the reduction; the provocation must be sufficient to cause a person of average disposition in the same situation, knowing the same facts, to have reacted from passion rather than judgment. [¶] There was no error in giving these instructions." (*People v. Jones*, *supra*, 223 Cal.App.4th at p. 1001.)

The court's jury instruction, CALCRIM No. 521, identified the specific elements the prosecution was required to prove in order to obtain a first degree murder conviction —"willfully, deliberately, and with premeditation"—and defined those elements for the jury. If the jury believed that defendant was provoked in a manner that would prevent it from finding those elements beyond a reasonable doubt, nothing in the court's other jury instructions or response to the jury's question prevented or misled the jury from doing so. The detailed discussion of provocation in CALCRIM No. 570 applies only to voluntary manslaughter. There is no reasonable likelihood the jury believed this discussion applied to its consideration of first degree murder as well.

We do not believe that the jury would have interpreted the court rereading CALCRIM No. 570 in response to its question as meaning that the elements of provocation for purposes of voluntary manslaughter and second degree murder were the same or that it should disregard CALCRIM Nos. 521 and 522 in determining whether provocation prevented the murder from being first degree murder.

As we find the trial court's response to the jury's question did not misstate the law, defendant's failure to object to the trial court's response or seek additional clarification has forfeited that claim.

### 2. *Defendant was not prejudiced by the trial court's response to the jury.*

A court's failure under section 1138 to adequately answer a jury's question "is subject to the prejudice standard of *People v. Watson*, *supra*, 46 Cal.2d 818, 836," i.e., whether the error resulted in a reasonable probability of a less favorable outcome. (*People v. Roberts* (1992) 2 Cal.4th 271, 326.)

Jurors here were instructed pursuant to CALCRIM No. 521 that, "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." "By finding defendant was guilty of first degree murder, the jury necessarily found defendant premeditated and deliberated the killing. This state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion … and clearly demonstrates that defendant was not prejudiced by the [court's response to the jury]." (*People v. Wharton* (1991) 53 Cal.3d 522, 572 (*Wharton*); accord, *People v. Peau* (2015) 236 Cal.App.4th 823, 830–831 [following the reasoning of *Wharton* and concluding that, because the jury had been instructed on first degree murder under a theory of premeditation and deliberation pursuant to CALCRIM No. 521, the defendant's "conviction of first degree murder render[ed] any failure to give a heat-of-passion instruction harmless because the jury necessarily found that the murder was willful, deliberate, and premeditated"]; see also *Franklin*, *supra*, 21 Cal.App.5th at

p. 894 ["the jury's finding of premeditation and deliberation is 'manifestly inconsistent with having acted under the heat of passion' and nullifies any potential for prejudice here"].)

On the record before us, we have little difficulty concluding that the jurors would have returned the same verdict of first degree murder even if the trial court had not responded to their question as it did. We therefore conclude that any error was harmless.

### III. *Defendant forfeited his objection to the prosecution's closing argument, and counsel did not render ineffective assistance of counsel as the prosecutor's argument was proper.*

#### A. Background

During closing argument, the prosecutor read from CALCRIM No. 521 regarding first degree premeditated and deliberate murder and explained that a cold, calculated decision to kill could be reached quickly:

> "A common example for anyone who likes baseball or coming up on spring training, the amount of time that batter has to decide if he's going to swing, let the ball go past, bunt, step back is in a flash of a second. From the time that pitcher releases that ball, that 99 miles per hour fastball, that batter has to make a distinct, deliberate, willful, premeditated decision that quickly. And that's how quickly your willful, premeditated, and deliberate decisions can be made.

> "Now, we make these determinations every single day when we get on that road. When that light turns yellow, we have all been there, do I go or do I stop? And think about all of the decisions and considerations of the consequences of the considerations that we make at that very split second. You have to look at oncoming traffic. You have to look behind you and make sure no one's coming up quickly, because you don't want to press the brake. We do this every day. These are examples of how quickly it can be to make a willful, and premeditated decision."

Defendant argues that the prosecutor committed misconduct by including these analogies in her closing argument because they misstated the law relating to premeditated murder. Because defense counsel failed to object, defendant seeks to avoid forfeiture of this argument by arguing ineffective assistance of counsel. The People argue that

42.

because the argument is meritless, defendant fails to show prejudice from counsel's failure to object and, therefore, the argument is forfeited. We agree.

## B. Standard of Review and Applicable Law

"In California, the law regarding prosecutorial misconduct is settled: 'When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated. Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury.'" (*People v. Masters* (2016) 62 Cal.4th 1019, 1052.) When a claim of misconduct is based on the prosecutor's comments before the jury, we consider whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. (*People v. Woodruff* (2018) 5 Cal.5th 697, 755; *People v. Adams* (2014) 60 Cal.4th 541, 568.) We consider the challenged statements in context and view the argument as a whole. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 894 (*Covarrubias*); *People v. Valencia* (2008) 43 Cal.4th 268, 304 abrogated on other grounds by *People v. Rangel* (2016) 62 Cal.4th 1192, 1219.) It is misconduct for a prosecutor to misstate the law during argument. (*People v. Rivera*, *supra*, 7 Cal.5th at p. 337; *People v. Bell* (2019) 7 Cal.5th 70, 111.)

To preserve a claim of prosecutorial misconduct, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument. (*People v. Linton* (2013) 56 Cal.4th 1146, 1205.) Here, defense counsel did not object to the challenged portions of the prosecutor's argument, and therefore any claim of prosecutorial misconduct has been forfeited. (*People v. Williams* (2016) 1 Cal.5th 1166, 1188; *Covarrubias*, *supra*, 1 Cal.5th at pp. 893–894.)

Recognizing this, defendant contends counsel's failure to object amounted to ineffective assistance. To establish ineffective assistance of counsel, a defendant has the

burden to show counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. (*People v. Bell*, *supra*, 7 Cal.5th at pp. 125–126; *People v. Brown* (2014) 59 Cal.4th 86, 109.)

An intentional killing is premeditated and deliberate if it is considered beforehand and occurred as the result of preexisting thought and reflection, rather than as the product of an unconsidered or rash impulse. (*People v. Pearson* (2013) 56 Cal.4th 393, 443; *People v. Burney* (2009) 47 Cal.4th 203, 235.) To prove a killing was premeditated and deliberate, it is " 'not … necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his or her act.' " (*People v. Disa* (2016) 1 Cal.App.5th 654, 665; see § 189, subd. (d).) The " ' "process of premeditation and deliberation does not require any extended period of time." ' " (*People v. Salazar*, 63 Cal.4th 214, 245.) The true test is not the duration of time, but the extent of the reflection. (*Ibid*.) " 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly ….' " (*People v. Potts* (2019) 6 Cal.5th 1012, 1027; see *People v. San Nicolas* (2004) 34 Cal.4th 614, 658–659 [planning involving premeditation requires "nothing more than a 'successive thought[] of the mind' "].)

C. **Analysis**

Defendant argues that the decision to enter an intersection or to swing at a pitch is not the result of preexisting thought and reflection, but rather, the result of " 'unconsidered or rash impulse' " and is reflexively based upon many prior decisions of that nature. The prosecutor's argument "trivialized the prosecution's burden to establish the most culpable of mental states." We disagree.

" '[A] prosecutor is given wide latitude during argument,' " and " 'counsel during summation may state matters not in evidence, but which are common knowledge or are

illustrations drawn from common experience, history or literature.' " (*Wharton*, *supra*, 53 Cal.3d at p. 567.)

Here, the prosecutor presented the baseball analogy as an example of someone who was carefully weighing considerations before making a decision. The prosecutor did not refer to the batter's decision as reflexive or akin to a rash impulse. She referred to the number of considerations a batter must undertake once the pitch is released, "that batter has to decide if he's going to swing, let the ball go past, bunt, step back is in a flash of a second." She explained that the batter had to "make a distinct, deliberate, willful, premeditated decision that quickly." The prosecutor's point was that a baseball player has to make a conscious decision to swing at a particular pitch. Thus, the prosecutor's illustration was aimed at showing the conscious decisions involved in a batter's efforts.

The prosecutor also used the yellow light analogy to describe circumstances in which a driver makes a decision after considering various factors. The Supreme Court upheld a similar analogy in *People v. Avila* (2009) 46 Cal.4th 680. In that case, the court stated: "Nor, contrary to [the] defendant's assertion, did the prosecutor argue that 'the "cold, calculated" judgment of murder is the equivalent of deciding whether to stop at a yellow light or proceed through the intersection.' Rather, the prosecutor used the example of assessing one's distance from a traffic light, and the location of surrounding vehicles, when it appears the light will soon turn yellow and then red, and then determining based on this information whether to proceed through the intersection when the light does turn yellow, as an example of a 'quick judgment' that is nonetheless 'cold' and 'calculated.' He then immediately said, 'Deciding to and moving forward with the decision to kill is similar, but I'm not going to say in any way it's the same. There's great dire consequences that have a difference here.' " (*Id*. at p. 715.) Defendant argues that *Avila* is distinguishable, because the prosecutor added that the decision to kill differs from driving through a yellow light due to the consequences. We disagree. The distinction between the two cases concerned the consequences of, not the mental state

required for, first degree murder. In both *Avila* and the present case, the prosecutor used the yellow light analogy as an example of making a quick decision. In our view, both analogies fall within the wide latitude given to a prosecutor during closing argument. (See *Wharton*, *supra*, 53 Cal.3d at p. 567.)

Moreover, the prosecutor did not argue that defendant premeditated in a split second. Her point was that premeditation did not require hours, days, or weeks of thought. After making the baseball and traffic light analogies, the prosecutor argued that premeditation and deliberation was evident because defendant armed himself with a gun, followed Montgomery to the store, followed Montgomery back from the store, parked near Montgomery when arriving at the trailer park, ascertained Montgomery was the man Chatten had told him about, approached him, confronted him, and shot him. Viewed in context, reasonable jurors would not have understood the prosecutor to suggest that a reflexive, thoughtless action could suffice to prove premeditation and deliberation. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 894 [we do not lightly infer that the jury drew the most, rather than the least, damaging meaning from the prosecutor's statements]; *People v. Shazier* (2014) 60 Cal.4th 109, 144.) Certainly, we cannot say that the prosecutor's illustrations amounted to deceptive or reprehensible methods or infected the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process.

Since the prosecutor did not engage in misconduct in her argument to the jury regarding premeditation and deliberation, trial counsel did not render ineffective assistance when he failed to object because the objection would have been futile. Contrary to defendant's position, the People's use of the analogies was not improper, and defense counsel will not be found ineffective for failing to make a futile objection. (See *People v. Anderson* (2001) 25 Cal.4th 543, 587 ["[T]here is no merit to defendant's alternative contention that his trial counsel was ineffective for failing to object under Evidence Code section 352. Counsel is not required to proffer futile objections."].)

We reject defendant's argument that the prosecutor engaged in misconduct during her closing argument.

## IV.    *The effect of new sentencing legislation.*

### A.    **Background**

The probation officer recommended that the sentence on count 3 be stayed pursuant to former section 654. During the sentencing hearing, the prosecutor argued for a consecutive sentence because the assault with a firearm charge was based upon the act of putting the firearm to Montgomery's head and the murder involved picking up the gun that Montgomery had swatted out of defendant's hand, pointing it at Montgomery's head, and pulling the trigger. The trial court responded, "I think it was pretty much all of one course of conduct.… I am going to make this concurrent," and ordered the term of imprisonment on count 3 concurrent to count 1.

In addition, the trial court sentenced defendant on count 3 to the upper term of four years as recommended by the probation officer.[24]

At the time of defendant's sentencing, former section 654, subdivision (a) required the trial court to punish defendant in accordance with the provision that provided for the longest potential term of imprisonment. The statute "expressly prohibits separate punishment for two crimes based on the same act, but has been interpreted to also preclude multiple punishment for two or more crimes occurring within the same course of conduct pursuant to a single intent." (*People v. Vargas* (2014) 59 Cal.4th 635, 642; accord, *People v. Harrison* (1989) 48 Cal.3d 321, 335.) Effective January 1, 2022, section 654 was amended by Assembly Bill No. 518 (2021–2022 Reg. Sess.) to provide the trial court with the discretion to choose the count for which it will impose

---

**24**    The aggravating circumstances identified in the probation officer's report were the offense involved great violence that disclosed a high degree of cruelty, viciousness or callousness, and defendant induced others to participate in the crime or occupied a position of leadership in relation to other participants.

punishment.  (Stats. 2021, ch. 441, § 1.)  The probation officer recommended count 3's sentence be stayed pursuant to former section 654, but the trial court ordered the sentence on count 3 to be served concurrent to count 1 and did not reference former section 654 or use the word "stay."

Additionally, effective January 1, 2022, section 1170 was amended by Senate Bill No. 567 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 731, § 1.3) and Assembly Bill No. 124 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 695, § 5) in two respects that are relevant here. First, a court must "order imposition of a sentence not to exceed the middle term," except under narrow circumstances.  (§ 1170, subd. (b)(1).)  An upper term may be imposed when justified by aggravating circumstances and the facts underlying those circumstances have been stipulated to by the defendant or found true by a jury or by the judge in a court trial.  (*Id*., subd. (b)(2).)  Here, defendant was sentenced to the upper term on count 3 based on "facts … [not] stipulated to by the defendant, or … found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial," as required under the amended statute.  (§ 1170, subd. (b)(2).)

Second, section 1170 was also amended to include a presumption in favor of the lower term sentence when a defendant is under 26 years of age at the time of the offense, unless the court finds that the aggravating circumstances outweigh the mitigating circumstances.  (§ 1170, subd. (b)(6)(B).)  Defendant was under 26 years of age when he committed the offenses.

### B.     Applicable Law and Analysis

Defendant contends that because his case is not yet final on appeal, he is entitled to the benefits of sections 654 and 1170, as amended, pursuant to the principles of retroactivity set forth in *In re Estrada* (1965) 63 Cal.2d 740.  The People agree the amendments are retroactive.  We accept this concession.

The Supreme Court has held, when a court is unaware of the scope of its discretionary powers, "the appropriate remedy is to remand for resentencing unless the

48.

record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) However, "[w]e are not required to remand to allow the court to exercise its discretion if 'the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not [have imposed a different sentence]' even if it had the discretion." (*People v. Jones* (2019) 32 Cal.App.5th 267, 272–273.)

After reviewing the trial court's comments and sentence in this case, we are unable to conclude that the trial court would not exercise its discretion to impose a different sentence and will remand for resentencing. In light of our remand, we do not consider whether defendant forfeited his claim that the trial court violated due process when imposing fines, fees, and assessments without determining whether defendant had the ability to pay. Defendant may make this request on remand.

## V.     *Defendant's actual custody credits.*

The trial court awarded defendant 868 days of custody credit as set forth in the probation officer's report. The report was prepared with reference to defendant's initial sentencing date of March 21, 2019. However, defendant's sentencing was continued until June 13, 2019, and the custody credits were not updated to reflect the later date. Actual custody credits are calculated by adding together "all days of custody" defendant has served. (§ 2900.5, subd. (a).)

The parties agree that defendant earned a total of 952 days custody credits as of June 13, 2019, and that the trial court erred. The trial court should correct this error on remand.

### DISPOSITION

The sentence is vacated, and the matter is remanded to the trial court to resentence defendant under section 1170, as amended by Senate Bill No. 567 (Stats. 2021, ch. 731, § 1.3) and Assembly Bill No. 124 (Stats. 2021, ch. 695, § 5), and section 654, as

amended by Assembly Bill No. 518 (Stats. 2021, ch. 441, § 1), if the trial court finds section 654 applicable. Upon remand, the trial court shall recompute the custody credit award.

In all other respects, the judgment is affirmed.


                                                                  HILL, P. J.
WE CONCUR:


LEVY, J.


MEEHAN, J.